USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 9/1/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X

**SARA LOUISE PETTY,**

**Plaintiff,**

**-against-**

**MAISON HOSPITALITY FURNISHINGS, and YINGZI "SHARON" XIA, individually,**

**Defendants.**

---------------------------------------------------------------X

**25-CV-06342 (SN)**

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

Sara Louise Petty ("Plaintiff") brings this suit against Maison Hospitality Furnishings ("Maison") and Yingzi "Sharon" Xia ("Xia") (collectively, "Defendants"), alleging that they violated the timely payment and anti-retaliation provision under the New York State Freelance Isn't Free Act (the "NYS FIFA") and the New York City Freelance Isn't Free Act (the "NYC FIFA"), as well as committed defamation in violation of New York common law. In the alternative to her FIFA and defamation claims, Plaintiff alleges breach of contract and tortious interference claims, respectively. Plaintiff also pleads that Defendants violated the New York Labor Law's ("NYLL") anti-retaliation protection provided for whistleblowers.

Defendants move to dismiss all of Plaintiff's claims pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

### I. Factual Background

The Court assumes the following facts as true for purposes of this motion.[1] Maison is a California-based company that specializes in the design and manufacture of furniture for the hospitality industry. See ECF No. 18, Amended Complaint ("Compl."), ¶¶ 12, 14. In November 2023, Maison's owner, President, and CEO (Xia) met Plaintiff at a trade show in New York City. See ECF No. 17, Declaration of Sharon Xia ("Xia Decl."), ¶ 1; Compl. ¶ 13, ¶ 19 at page 5.[2] Plaintiff claims she was specifically sought out by Maison's then-VP of Sales, Debra Centurion ("Centurion"), who was working in New York at the time for Defendants. See Compl. ¶¶ 22–24 at page 4, ¶¶ 20–21 at page 5.

In January 2024, Plaintiff provided Defendants with a proposed service agreement showcasing her "creative expertise and strategic vision." Id. ¶ 22 at page 6. Plaintiff and Defendants subsequently entered into an agreement (the "Service Agreement"), whereby Plaintiff was to be paid at a rate of $85 per hour for 16 hours of "weekly social media work," and

---

[1] The facts in this Opinion and Order are drawn primarily from Plaintiff's Amended Complaint (the operative complaint in this action), as well as the Declaration of Sharon Xia and the exhibit attached to it. See ECF No. 17. Defendants filed the Xia Declaration and the accompanying exhibit with their first motion to dismiss (which was denied as moot, see ECF No. 23), but they failed to refile the Xia Declaration with their current motion to dismiss. The Court, however, still considers the Xia Declaration and the accompanying exhibit in addressing Defendants' Rule 12(b)(2) motion. See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 86 (2d Cir. 2013) (finding that in resolving a motion to dismiss for lack of personal jurisdiction, a district court may consider materials outside the pleadings). But in deciding Defendants' Rule 12(b)(6) motion, the Court considers only the exhibit to the Xia Declaration, which is a copy of the parties' proposed service agreement. See ECF No. 17 at 3–7. The proposed service agreement is referenced in and integral to the Amended Complaint, as Plaintiff's claims arise out of this proposed service agreement and neither side questions the authenticity of the exhibit. See ECF No. 18 ¶ 22 at page 6 (referencing Plaintiff's proposed service agreement); Sierra Club v. Con-Strux, LLC, 911 F.3d 85, 88 (2d Cir. 2018) ("A complaint is also deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint.") (internal quotation marks and citation omitted).

[2] Plaintiff's Amended Complaint erroneously repeats the paragraph numbering for paragraphs 19–29 and 117–31. For clarity, the Court specifies the ECF page number when citing those paragraphs.

$120 per hour for "specialized marketing and advertising projects." Id. The Service Agreement also provided that "[a]ny additional time spent or needed would be billed upon approval by [the] manager." See Xia Decl., Ex. A, at 6.

Throughout her time working for Defendants as an independent contractor, Plaintiff worked remotely in New York State and spent approximately 10% to 25% of her time working in New York City specifically. Id. ¶¶ 23–25 at page 6. Xia and Maison's VP of Sales, Stefan Lasek ("Lasek"), served as Plaintiff's joint supervisors and were responsible for assigning her tasks and approving her work. Id. ¶¶ 26–27 at page 6.

Plaintiff claims that over the course of her employment, Defendants deviated from the terms of the Service Agreement by not paying her at the appropriate rates, failing to compensate her for several additional hours that she worked, and demanding services beyond the scope of the Service Agreement. Id. ¶ 28 at page 6, ¶ 35. Specifically, Plaintiff alleges that Defendants demanded additional work on a "near-weekly basis," required her to be available to discuss business needs on the phone whenever Xia called, and "routinely" failed to pay her for her labor. Id. ¶¶ 31. Moreover, within weeks of beginning her work for Maison, Defendants "coerced" Plaintiff into working on projects she never consented to undertake, including preparing for major trade shows, contributing to advertising projects for trade publications, creating company newsletters, emailing marketing materials, and creating custom tablecloths and backdrops. Id. ¶¶ 35, 37. Plaintiff also alleges that she was forced to work several additional hours due to Xia requesting unnecessary changes and "do-overs" to last-minute projects, and that Plaintiff was obligated to cover several unpaid business expenses on her personal credit card. Id. ¶¶ 46, 49, 54.

In May 2024, Plaintiff also worked on redesigning Defendants' website for $14,500, which she asserts was done at a rate significantly below market standards. Id. ¶ 38. Plaintiff

claims that she was compelled to cover the website developer and technical support fees, which Defendants refused to later compensate her for. Id. ¶¶ 39, 41.

Plaintiff estimates that she routinely worked between 25 to 30 hours per week, which exceeded the weekly 16-hours cap that the parties agreed to. Id. ¶ 45. In addition to failing to compensate her for those extra hours, Defendants also never paid Plaintiff at the agreed rate of $120 per hour for any of her work on specialized marketing and advertising projects. Id. ¶¶ 47–48. Plaintiff alleges that this "effectively robb[ed] her of upwards of $36,000.00 in wages." Id. ¶ 50. When Plaintiff repeatedly attempted to address her compensation concerns with Defendants, she was "met with outright deceit and hostility." Id. ¶ 41. At one point, Lasek acknowledged Plaintiff's expanded workload and promised to approve the scope of her engagement to 22 hours per week. Id. ¶ 42. However, he subsequently retracted his commitment, and Defendants refused to pay Plaintiff more than 16 hours per week of work. Id. ¶ 43.

Plaintiff further alleges that Defendants retaliated against her when she sought compensation for her unpaid labor. She claims that Defendants threatened her with litigation if she stopped working and that Xia harassed her by repeatedly calling Plaintiff during "unsociable hours . . . to levy baseless accusations." Id. ¶¶ 52, 59, 67.

Moreover, during a trade show in New York City in November 2024, Xia allegedly said in Plaintiff's presence that she wanted to "hire someone to break the legs" of one of Maison's employees, Centurion. Id. ¶ 74. A few days later, Defendants sent Plaintiff a non-disclosure agreement to prevent Plaintiff from discussing or taking any action related to Xia's threat against Centurion. Id. ¶¶ 80–82. When Plaintiff said she wanted to review the non-disclosure agreement with an attorney, Xia told Plaintiff that she had to sign the agreement immediately "if [she] want[ed] to continue working with [Defendants]." Id. ¶ 84. After Plaintiff refused to immediately

sign the non-disclosure agreement, Defendants retaliated against Plaintiff by abruptly terminating her contract. Id. ¶ 86.

Upon her termination, Plaintiff retained counsel, who subsequently sent Defendants a detailed invoice for uncompensated hours and expenses, totaling $37,594.08. Id. Defendants, however, not only refused to pay the unpaid invoice, but also demanded that Plaintiff perform additional unpaid labor by assisting with the transfer of all website assets. Id. ¶ 63. As a result, Plaintiff continued paying for and maintaining Defendants' web presence without any compensation for several months after her termination. Id. ¶¶ 63, 88, 114.

Plaintiff also incurred additional fees and expenses due to Defendants' delay in cooperating with Plaintiff with the return of Defendants' website assets. Id. ¶¶ 63, 87, 90. Although, Defendants later accused Plaintiff of sabotaging Maison's website and holding it "hostage," Defendants repeatedly ignored Plaintiff's emails and instructions regarding the website transfer. Id. ¶¶ 90, 98, 105, 107–12. Plaintiff was ultimately able to complete the transfer of the website materials to Defendants on June 26, 2025. Id. ¶ 113.

Finally, Plaintiff alleges that Defendants retaliated against her by contacting one of her other employers, Samelson Chatelane, to "warn" them about Plaintiff. Id. ¶¶ 115–25 at pages 19–20. Xia allegedly called Samelson Chatelane "multiple times to badmouth" Plaintiff and falsely told a customer service representative at Samelson Chatelane that Plaintiff "ruined [Maison's] website" and that Plaintiff was "in a lawsuit" with Defendants. Id. ¶¶ 123–24 at page 20. Plaintiff's employment contract with Samelson Chatelane was terminated shortly thereafter, which Plaintiff claims occurred as a direct result of Xia's defamatory statements. Id. ¶¶ 130–31 at page 21.

## II. Procedural Background

Plaintiff initiated this action on August 1, 2025. See ECF No. 1. The parties consented to my jurisdiction on September 15, 2025. See ECF No. 14. On September 30, 2025, Defendants filed their first motion to dismiss pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. See ECF Nos. 15–17. The Court denied this initial motion to dismiss as moot after Plaintiff filed her Amended Complaint on October 8, 2025. See ECF Nos. 18, 23.

In her Amended Complaint, Plaintiff brings the following claims: (i) failure to provide timely payment in violation of the New York State Freelance Isn't Free Act ("NYS FIFA"), N.Y. Gen. Bus. Law § 1410 et seq. (Count I); (ii) failure to provide timely payment in violation of the New York City Freelance Isn't Free Act ("NYC FIFA"), N.Y.C. Admin. Code § 20–927 et seq. (Count II); (iii) in the alternative to her FIFA claims, breach of contract in violation of New York common law (Count III); (iv) retaliation in violation the NYS and NYC FIFA (Count IV); (v) retaliation in violation of New York Labor Law ("NYLL") § 740 (Count V); (vi) defamation in violation of New York common law (Count VI); and, (vii) in the alternative to her defamation claim, tortious interference in violation of New York common law (Count VII). See Am. Compl. ¶¶ 117–78 at pages 21–29. On October 21, 2025, Defendants filed a motion to dismiss all claims in the Amended Complaint pursuant to Rules 12(b)(2) and 12(b)(6). See ECF Nos. 20–21.

## DISCUSSION

Where a defendant moves to dismiss a complaint both for lack of personal jurisdiction and for failure to state a claim, courts must consider first whether they can exercise personal jurisdiction. See Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963); Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 224 (S.D.N.Y. 2013). Accordingly, the Court turns first to

Defendants' motion to dismiss under Rule 12(b)(2) before addressing the merits of Defendants' Rule 12(b)(6) motion.

## I. Motion to Dismiss Under Rule 12(b)(2)

### A. Legal Standard

"When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999). The court must "construe the pleadings and any supporting materials in the light most favorable to the plaintiff[]." Licci ex rel. Licci v. Lebanese Can. Bank, SAL, 732 F.3d 161, 167 (2d Cir. 2013). However, the court need not "accept as true a legal conclusion couched as a factual allegation." In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks and citation omitted).

"There are two types of personal jurisdiction: specific and general." Sonera Holding B.V. v. Çukurova Holding A.S., 750 F.3d 221, 225 (2d Cir. 2014). "General jurisdiction permits a court to exercise personal jurisdiction over a defendant regardless of whether the underlying claim has a connection to the forum," whereas specific jurisdiction, which is at issue in this case, "requires a connection between the forum exercising jurisdiction over the defendant and the underlying controversy that gave rise to the claim." Varn v. Orchestrade, Inc., No. 19-CV-2875 (MKB), 2020 WL 13558690, at *5 (E.D.N.Y. Mar. 30, 2020) (citing Sonera, 750 F.3d at 225). Under New York law, courts exercise specific jurisdiction pursuant to CPLR § 302.

Section 302 is New York's long-arm statute, which permits courts to exercise specific jurisdiction over a non-domiciliary party that "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. CPLR § 302(a)(1). Section 302(a)(1)

has two requirements: (1) the defendant must "have transacted business within the state," either itself or through an agent, and (2) the cause of action must "arise from that business activity." Licci, 732 F.3d at 168. "[A] defendant's lack of physical presence in the state is not dispositive of whether he transacts business within the state"; specific jurisdiction can still be established "so long as the defendant's activities [within the state] were purposeful and there is a substantial relationship between the transaction and the claim asserted." Varn, 2020 WL 13558690, at *5; see also Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 169 (2d Cir. 2010) ("[A] defendant need not be physically present in New York to transact business there . . . so long as he engages in [p]urposeful activities or volitional acts through which he avails [him]self of the privilege of conducting activities within the . . . State, thus invoking the benefits and protections of its laws.") (citations and internal quotation marks omitted).

In considering whether a defendant purposefully transacts business in New York, courts must look at "the quality of the defendant['s] New York contacts." Fischbarg v. Doucet, 9 N.Y.3d 375, 380 (2007); see also Best Van Lines v. Walker, 490 F.3d 239, 246 (2d Cir. 2007) ("Courts look to the totality of the defendant's activities within the forum to determine whether a defendant has transacted business in such a way that it constitutes purposeful activity satisfying the first part of the test.") (internal quotation marks and citations omitted). Further, to establish that a cause of action arises from a particular business activity, a plaintiff must show that there is a "substantial relationship" or "articulable nexus" between the claim asserted and the actions taken in New York. Best Van Lines, 490 F.3d at 246; see also Eades v. Kennedy, PC L. Offs., 799 F.3d 161, 168 (2d Cir. 2015) ("[P]roof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's

activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.”).

In addition to determining whether jurisdiction under New York law exits, the court must also consider whether the exercise of personal jurisdiction over a non-domiciliary defendant “comports with due process protections established under the United States Constitution.” Licci, 732 F.3d at 168. “Due process considerations require that the defendant ‘have certain minimum contacts [with the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.’” Id. at 169 (quoting Int’l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement, 326 U.S. 310, 316 (1945)). “The requisite ‘minimum contacts’ analysis ‘overlaps significantly’ with New York’s § 302(a)(1) inquiry into whether a defendant transacted business in the State.” Minnie Rose LLC v. Yu, 169 F. Supp. 3d 504, 515 (S.D.N.Y. 2016) (quoting Brown v. Web.com Grp., Inc., 57 F. Supp. 3d 345, 358 (S.D.N.Y. 2014)). “Where the claim arises out of, or relates to, the defendant’s contacts with the forum—*i.e.*, specific jurisdiction [is asserted]—minimum contacts [necessary to support such jurisdiction] exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there.” Licci, 732 F.3d at 170 (2d Cir. 2013) (internal quotation marks and citation omitted).

To determine the reasonableness of exercising personal jurisdiction over an out-of-state defendant, the court must consider “[(1)] the burden on the defendant, [(2)] the interests of the forum State, and [(3)] the plaintiff’s interest in obtaining relief. It must also weigh in its determination [(4)] the interstate judicial system’s interest in obtaining the most efficient resolution of controversies; and [(5)] the shared interest of the several States in furthering

fundamental substantive social policies." Chloe, 616 F.3d at 173 (quoting Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty., 480 U.S. 102, 113 (1987)).

**B. Application**

**1. Non-Defamation Claims (Counts I–V and VII)**

Defendants argue that none of the grounds for exercising New York's long-arm statute under CPLR § 302 apply to Plaintiff's claims. See ECF No. 21, Defendants' Motion to Dismiss Brief ("Def. Br."), at 7–9. Because Maison is a California company and Xia resides in California, see Xia Decl. ¶¶ 2–3, Plaintiff contends that specific personal jurisdiction is established because Defendants sufficiently transacted business in New York through the Service Agreement with Plaintiff, which ultimately gave rise to this action. See ECF No. 24, Plaintiff's Opposition Brief ("Pl. Br."), at 15–18. Since the CPLR § 302 jurisdictional analysis is different for defamation claims, the Court first addresses whether it has jurisdiction over Defendants with respect to Plaintiff's FIFA, breach of contract, retaliation, and tortious interference claims (Counts I–V and VII) (collectively, the "non-defamation claims").

Plaintiff's Amended Complaint alleges sufficient facts to establish that this Court may exercise specific personal jurisdiction over Defendants with respect to Plaintiff's non-defamation claims. The following allegations, in particular, sufficiently show that Defendants purposefully availed themselves of the privilege of conducting business in New York: (1) Xia met Plaintiff during a trade show in New York City in November 2023 (see Compl. ¶ 19 at page 5); (2) shortly after, Defendants considered Plaintiff's work proposal and entered into a Service Agreement with her while she was living in New York (id. ¶ 11, ¶ 22 at page 6); (3) Maison's then-VP of Sales (Lasek) supervised Plaintiff while he worked in New York (id. ¶¶ 26–27 at page 6); (4) Xia and Lasek consistently communicated with Plaintiff regarding her work via

phone and email while Plaintiff was in New York state (id. ¶ 24 at page 6, ¶ 52, ¶ 81); (5) Plaintiff frequently participated in remote meetings with Xia and other Maison employees, prepared social media posts, assisted with event planning, and performed web design work in New York (id. ¶ 24 at page 6; ¶ 34); (6) Xia made threats against another Maison employee while attending a trade show in New York City (id. ¶¶ 74–77); and (7) Xia called Samelson Chatelane (a New York-based company) "multiple times to badmouth Plaintiff, her work, and her professional reputation" (id. ¶ 123 at page 20).

Courts in this Circuit have consistently found that similar actions as those taken by Defendants are sufficient to establish specific jurisdiction. See e.g., Varn, 2020 WL 13558690, at *6 (finding that an out-of-state defendant supervising the plaintiff's work "via text message, phone, or email" while Plaintiff was located in New York, supported a showing that defendant transacted business in New York); Williams v. Preeminent Protective Servs., Inc., 81 F. Supp. 3d 265, 268–69 (E.D.N.Y. 2015) (finding that specific jurisdiction over the individual defendant CEO of plaintiff's employer was appropriate where the CEO "orally agreed to let plaintiff work as a marketing assistance provider" and where plaintiff was required to participate in weekly conference calls) (internal quotation marks omitted); Tianbo Huang v. iTV Media, Inc., 13 F. Supp. 3d 246, 255 (E.D.N.Y. 2014) (finding specific personal jurisdiction over the individual defendant CEO of plaintiff's employer where the CEO "initially negotiated the employment contract with plaintiff" in New York and "forced plaintiff to work beyond his contract" in New York); see also SAS Grp., Inc. v. Worldwide Inventions, Inc., 245 F. Supp. 2d 543, 549 (S.D.N.Y. 2003) (noting that preliminary contract negotiations are considered transactions under New York's long-arm statute).

In addition, the Amended Complaint also includes sufficient facts to show that Plaintiff's non-defamation claims arose from Defendants' business activities in New York. With respect to her FIFA and breach of contract claims (Counts I–III), Plaintiff sufficiently alleges that Defendants contacted Plaintiff after meeting her in New York and subsequently failed to compensate her for work she performed in New York in accordance with the Service Agreement. See Compl. ¶¶ 28–29 at pages 6–7, ¶¶ 30–32. Regarding her retaliation and tortious interference claims (Counts IV, V, and VII), Plaintiff has alleged sufficient facts showing that after she refused to sign a non-disclosure agreement related to Xia's hostile comments made during a New York trade show, Defendants immediately terminated her contract (id. ¶¶ 80–86), threatened her with litigation (id. ¶¶ 59, 87), and called another one of Plaintiff's clients to interfere with her separate business relations (id. ¶¶ 117–31 at pages 19–21). Plaintiff's non-defamation claims therefore satisfy the "arising-under" requirement pursuant to New York's long-arm statute. See N.Y. CPLR § 302.

The Court is also satisfied that its exercise of personal jurisdiction under CPLR § 302 comports with due process. As discussed above, Defendants purposefully availed themselves of the New York forum by entering into an agreement with Plaintiff after meeting her at a trade show in New York and by supervising the work she performed in New York. See Compl. ¶¶ 19–27 at pages 5–6. Defendants' contacts with New York thus satisfy the minimum contacts inquiry required for due process. See Chloe, 616 F.3d at 171 (concluding that personal jurisdiction over a defendant "comports with due process for the same reasons that it satisfies New York's long-arm statute").

Personal jurisdiction over Defendants is also "reasonable" because the majority of relevant factors for the Court to consider weigh in Plaintiff's favor. See id. at 173 ("A court must

consider [1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief. It must also weigh in its determination [4] the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and [5] the shared interest of the several States in furthering fundamental substantive social policies.") (internal quotation marks and citation omitted).

First, although Defendants may be "somewhat inconvenienced by defending a lawsuit in New York, it is not an unreasonable burden in light of [their] business contacts with New York and the modern conveniences of long-distance communication." Varn, 2020 WL 13558690, at *8 (internal quotation marks and citation omitted); see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 129–30 (2d Cir. 2002) ("Even if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.") (internal quotation marks and citation omitted); Tianbo Huang, 13 F. Supp. 3d at 256–57 ("Although there may be some burden on [the out-of-state CEO defendant] in defending himself in New York, his choice to conduct business there suggests that it is not an unreasonable burden.").

The second and third factors also support the reasonableness of New York as a forum because "New York has an interest in protecting the rights and safety of New York residents and Plaintiff resides in New York." Varn, 2020 WL 13558690, at *8; see also Chloe, 616 F.3d at 173 (noting that "a state frequently has a manifest interest in providing effective means of redress for its residents") (internal quotation marks and citation omitted). The fourth and fifth factors—"the interstate judicial system's interest in obtaining the most efficient resolution of controversies"

and "the shared interest of the . . . States in furthering fundamental substantive social policies"—are neutral in this case. Chloe, 616 F.3d at 173 (internal quotation marks and citation omitted). Therefore, because the majority of relevant factors weigh in Plaintiff's favor, the Court's exercise of jurisdiction over Defendants is reasonable and comports with due process.

Accordingly, Defendants' motion to dismiss for lack of jurisdiction with respect to Plaintiff's non-defamation claims (Counts I–V and VII) is denied.

**2. Defamation Claim (Count VI)**

Although the Court may exercise personal jurisdiction over Defendants with respect to Plaintiff non-defamation claims, "New York's long-arm statute expressly exempts defamation claims from most of its provisions[.]" Satanic Temple, Inc. v. Newsweek Digital LLC, 177 F.4th 202, 208 (2d Cir. 2026). The only provision that could allow the Court to exercise jurisdiction with respect to Plaintiff's defamation claim is CPLR § 302(a)(1), which authorizes "jurisdiction over anyone who 'transacts any business within the state or contracts anywhere to supply goods or services in the state[.]'" Id. (quoting N.Y. CPLR § 302(a)(1)). "New York courts construe 'transacts any business within the state' more narrowly in defamation cases than they do in the context of other sorts of litigation," being mindful of the state legislature's "intention to treat the tort of defamation differently from other causes of action." SPCA of Upstate New York, Inc. v. Am. Working Collie Ass'n, 18 N.Y.3d 400, 405 (2012) (quoting Best Van Lines, 490 F.3d at 248); see also Symmetra Pty Ltd. v. Hum. Facets, LLC, No. 12-CV-8857 (SAS), 2013 WL 2896876, at *6 (S.D.N.Y. June 13, 2013) (explaining that for defamation claims, "particular care must be taken to make certain that non-domiciliaries are not haled into court in a manner that potentially chills free speech without an appropriate showing [ ] that they purposefully transacted business here and that the proper nexus exists between the transaction and the defamatory

statements at issue.") (internal quotation marks and citation omitted). Accordingly, in considering whether to exercise personal jurisdiction with respect to Plaintiff's defamation claim, "not just any purposeful activity in New York will do—for instance, defamatory statements that were 'not written in or directed to New York' are not enough, even if 'they were posted on a medium that was accessible in this state[.]'" Satanic Temple, 177 F.4th at 208 (quoting SPCA, 18 N.Y.3d at 405). Rather, "[j]urisdiction over a claim for defamation will lie under CPLR § 302 only if the plaintiff shows that: (1) the defamatory utterance was purposefully directed at New York, as opposed to reaching New York fortuitously; and (2) the defendant transacted other business in New York that was directly connected to the claim asserted." Shah v. Bhagat, No. 26-CV-4683 (RA), 2026 WL 1970627, at *2 (S.D.N.Y. July 8, 2026) (internal quotation marks and citation omitted).

Defendants' activities in New York with respect to Plaintiff's defamation claim were quite limited. The Amended Complaint alleges that Xia called Samelson Chatelane (a New York company) "multiple times to badmouth Plaintiff, her work, and her professional reputation." Compl. ¶ 123 at page 20. In the context of a defamation claim, such limited interactions are generally insufficient to establish personal jurisdiction over non-domiciliaries pursuant to New York's long-arm statute. See, e.g., Satanic Temple, 177 F.4th at 210 (finding that limited communications with an in-state individual were not sufficient to establish personal jurisdiction under Section 302(a)(1) in the context of a defamation claim); SPCA, 18 N.Y.3d at 405 (finding that an out-of-state defendant placing three phone calls to a New York facility and briefly visiting New York twice were insufficient for establishing personal jurisdiction with respect to a defamation claim).

The Amended Complaint also does not allege any facts to establish anything unique about the relationship between Defendants' business transactions in New York and the alleged defamation. Xia's defamatory statements were not, for example, made to gain a competitive advantage over Samelson Chatelane or plausibly based on any sort of financial motive tied to New York specifically. Rather, unrelated to Maison's business, Xia called Samelson Chatelane merely to "badmouth" Plaintiff and her professional reputation. Compl. ¶ 123 at page 20. Expanding the reach of New York's long-arm statute in the context of a defamation claim to such limited circumstances would be contrary to the New York Legislature's intent that "non-domiciliaries . . . not [be] haled into court in a manner that potentially chills free speech without . . . the proper nexus [] between the transaction and the defamatory statements at issue." SPCA, 18 N.Y.3d at 405–06; see also Fischer v. Stiglitz, No. 15-CV-6266 (AJN), 2016 WL 3223627, at *7 (S.D.N.Y. June 8, 2016) (finding no personal jurisdiction was established where "[d]efendants' commercial activities in New York ha[d] no more substantial [a] relationship with the alleged defamation than their business interests in any other state") (internal quotation marks and citations omitted).

Accordingly, because the connection between the alleged defamatory statements and Defendants' New York activities is "too tangential" to support the exercise of personal jurisdiction with respect to Plaintiff's defamation claim, SPCA, 18 N.Y.3d at 405, Defendants' motion to dismiss for lack of personal jurisdiction is granted and Count VI of the Amended Complaint is dismissed. Since the Court grants Defendants' 12(b)(2) motion with respect to Count VI of the Amended Complaint, the Court declines to address the merits of Defendants' 12(b)(6) motion with respect to Plaintiff's defamation claim. See Arrowsmith, 320 F.2d at 221 (holding that "a court without such jurisdiction lacks power to dismiss a complaint for failure to

state a claim"); Mali v. Brit. Airways, No. 17-CV-685 (KPF), 2018 WL 3329858, at *5 n.5 (S.D.N.Y. July 6, 2018) ("[T]he grant of [a Rule 12(b)(2)] motion would obviate the need for consideration of Defendant's motion pursuant to Rule 12(b)(6).").

## II. Motion to Dismiss Under Rule 12(b)(6)

### A. Legal Standard

In considering a motion to dismiss brought under Rule 12(b)(6), the court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted). The moving party bears the burden of demonstrating that the claimant has failed to state a claim. See Pearl River Union Free Sch. Dist. v. Duncan, 56 F. Supp. 3d 339, 351 (S.D.N.Y. 2014). To survive a Rule 12(b)(6) motion to dismiss, the operative complaint "must allege sufficient facts, taken as true, to state a plausible claim for relief." Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013). The court should therefore not dismiss a complaint if the plaintiff has provided enough facts to state a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

While the court should construe the factual allegations in the light most favorable to a plaintiff, however, the court is "not bound to accept 'conclusory allegations or legal conclusions masquerading as factual conclusions.'" Rolon v. Henneman, 517 F.3d 140, 149 (2d Cir. 2008) (quoting Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002)); see also

Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

**B. Application**

**1. NYS FIFA Claim (Count I)**

Plaintiff alleges that Defendants violated the NYS FIFA, N.Y. Gen. Bus. Law § 1410 et seq., by failing to provide timely payment for the work that Plaintiff performed under the parties' Service Agreement. See Compl. ¶¶ 117–24 at pages 21–22 (Count I). Defendants contend that Count I of the Amended Complaint should be dismissed because the NYS FIFA does not apply retroactively to the agreement between the parties. See Def. Br. at 10–11. Specifically, Defendants argue that because the NYS FIFA went into effect on August 28, 2024, it cannot apply to Plaintiff's claims, which arise from a contract that was entered around January 2024. See id.; Compl. ¶ 22 at page 6.

The NYS FIFA provides wage protections for freelance workers, such as Plaintiff, and is modeled off a similar New York City law that was passed in 2017. See Maplebear Inc. v. City of New York, No. 25-CV-9979 (JGK), 2026 WL 181637, at *7 (S.D.N.Y. Jan. 22, 2026) (citing N.Y. Gen. Bus. Law §§ 1410–15) ("The FIFA establishes when freelance workers must be paid and requires that a contract between a freelance worker and his or her employer must be in writing."); Ortiz v. Consol. Edison Co. of New York, Inc., 801 F. Supp. 3d 260, 276–77 (S.D.N.Y. 2025). The Amended Complaint sufficiently alleges that Plaintiff is a "freelance worker" as defined under the NYS FIFA, and Defendants do not dispute this assertion. See N.Y. Gen. Bus. Law §§ 1410(3) (defining a "freelance worker" as "any natural person . . . that is hired or retained as an independent contractor by a hiring party to provide services in exchange for an amount equal to or greater than [$800]"); Compl. ¶ 22 at page 6 (alleging that "Defendants

engaged [Plaintiff's] services at $85 per hour for 16 hours of weekly social media work, with an additional art director rate of $120 per hour for specialized marketing and advertising projects"). Defendants also do not dispute that they qualify as a "hiring party" under the NYS FIFA. See N.Y. Gen. Bus. Law § 1410(4) (defining a "hiring party" as "any person who retains a freelance worker to provide any service"). The parties disagree, however, on whether the NYS FIFA applies to misconduct that arises from a contract entered before the NYS FIFA was enacted.

The Court of Appeals for the Second Circuit has not directly addressed the issue of retroactivity with respect to the NYS FIFA, and the caselaw interpreting the state statute is sparse. The Court, however, does not need to resolve whether the NYS FIFA can apply to Defendant's conduct *before* the law came into effect on August 28, 2024, because Plaintiff does not claim that *all* of Defendants' conduct violated the NYS FIFA. Rather, Plaintiff expressly argues that FIFA applies to only the conduct that occurred *after* its enactment. See Pl. Br. at 18. Therefore, the Court limits its analysis to whether the NYS FIFA can apply with respect to conduct that occurred after August 28, 2024 (when the NYS FIFA went into effect).

The Court finds nothing in the statute or caselaw interpreting the NYS FIFA that suggests that the state law should not apply to misconduct that occurred after its enactment merely because the misconduct arises out of a contract that was entered into before the law's effective date. On the contrary, rather than expressly limiting the applicability of the statute to freelance contracts entered after the law's effective date, the New York Legislature broadly provided that FIFA applies "[o]nce a freelance worker has commenced performance of the services under [a] contract." N.Y. Gen. Bus. Law § 1411(2). Such general language suggests that the protections afforded by the NYS FIFA were meant to apply to freelance work performed after the law came

into effect, even if such work arises out of a contract that was entered into before the law's effective date.

Under New York law, there is a general disinclination against giving a retroactive effect to a statute, unless such an application is expressly stated in the statute. See St. Clair Nation v. City of New York, 14 N.Y.3d 452, 456–57 (2010) ("It is well settled under New York law that retroactive operation of legislation is not favored by courts and statutes will not be given such construction unless the language expressly or by necessary implication requires it.") (internal quotation marks and citation omitted). But applying the NYS FIFA to misconduct that occurred after the law went into effect, even if such misconduct arose out of an agreement entered several months before the law's effective date, does not mean that the law is being applied retroactively. See Burke Mountain Acad., Inc. v. United States, 715 F.2d 779, 782 (2d Cir. 1983) ("A statute is not retroactive merely because it draws upon antecedent facts for its operation.") (internal quotation marks and citation omitted); Forti v. New York State Ethics Comm'n, 75 N.Y.2d 596, 609 (1990) (quoting McKinney's Cons. Laws of N.Y., Book 1, Statutes § 51) ("A statute is not retroactive . . . when made to apply to future transactions merely because such transactions relate to and are founded upon antecedent events."). Therefore, because there is nothing in the statute or caselaw interpreting the statute to suggest that the scope of the NYS FIFA is limited to agreements entered after the law's effective date, the Court applies the NYS FIFA to all post-enactment misconduct that arose from the Service Agreement.

The Amended Complaint alleges sufficient facts to plausibly establish that Defendants' post-enactment conduct violated the NYS FIFA. Plaintiff sufficiently claims that she performed freelance work for Defendants for at least a few months after the NYS FIFA went into effect, and that Defendants failed to pay her at the agreed rate of $120 per hour for any of the "specialized

marketing and advertising projects" she worked on. See Compl. ¶ 22 at 6, ¶¶ 48–53. Plaintiff also alleges sufficient facts to show that after August 28, 2024 (the effective date of the NYS FIFA), Defendants engaged in retaliatory actions that are expressly prohibited under the state statute. See Compl. ¶¶ 80–91, 105, 113–14, 117–31 at pages 19–21 (alleging that Defendants retaliated against Plaintiff by terminating her, threatening her with litigation, requiring her to complete additional uncompensated work related to Defendants' website, and calling another one of Plaintiff's clients to complain about Plaintiff); N.Y. Gen. Bus. Law § 1413 (providing that "[n]o hiring party . . . shall threaten, intimidate, discipline, harass, deny a work opportunity to, or discriminate against a freelance worker, or take any other action that penalizes a freelance worker for, or is reasonably likely to deter a freelance worker from, exercising or attempting to exercise any right guaranteed under [the statute]").

Accordingly, because Plaintiff alleges sufficient facts to plausibly establish that Defendants' post-enactment conduct violated the NYS FIFA, Defendants' motion to dismiss Count I of the Amended Complaint is denied.

**2. NYC FIFA Claim (Count II)**

Plaintiff also alleges that Defendants violated the New York City Freelance Isn't Free Act (the "NYC FIFA"), N.Y.C. Admin. Code § 20–927 et seq., by failing to pay Plaintiff for all the hours she worked at the agreed rate. See Compl. ¶¶ 125–33 at pages 22–23 (Count II). Similar to the state statute, the NYC FIFA was enacted to regulate the relationship between freelance workers and hiring parties with respect to freelance work performed in New York City. See Monzano-Moreno v. Libqual Fence Co., No. 18-CV-0161 (MKB)(AKT), 2021 WL 730663, at *18 (Feb. 5, 2021), report and recommendation adopted, 2021 WL 688295 (E.D.N.Y. Feb. 23, 2021). The NYC FIFA uses nearly identical definitions for "freelance worker" and "hiring party"

as the state version. Compare N.Y.C. Admin. Code § 20–927 with N.Y. Gen. Bus. Law § 1410. It similarly applies to agreements for freelance services worth $800 or more. See N.Y.C. Admin. Code § 20–928(a).

As discussed above, Defendants hired Plaintiff as an independent contractor and requested labor that totaled well-over $800. See Compl. ¶ 22 at page 6, ¶¶ 50, 62. The parties' Service Agreement therefore falls within the scope of the NYC FIFA, which (unlike the NYS FIFA) went into effect several years before the parties' engagement. Defendants, however, argue that the NYC FIFA does not apply to Plaintiff's claims because she did not principally work in New York City while employed by Maison. See Def. Br. at 12–13. Although she is a resident of Westchester County, New York, Plaintiff contends that the protections afforded under the NYC FIFA apply to her claims because she "spent anywhere from 10% to 25%" of her time working for Defendants in New York City. See Compl. ¶¶ 23–25 at page 6; Pl. Br. at 20–22.

The NYC FIFA does not provide any guidance regarding its geographic scope, and the statute is completely silent on how to assess scenarios where a freelancer does remote work for a company that is located outside of New York City. See Turner v. Sheppard Grain Enters., LLC, 68 Misc. 3d 385, 387 (N.Y. Sup. Ct. 2020). But while the caselaw interpreting the NYC FIFA is limited, New York courts have applied the city law to situations where a non-New York City resident performed *some* work in New York City. See, e.g., Eelco Van Den Berg v. Clinton Hall Holdings, LLC, 2019 WL 2995777, at *3 (N.Y. Sup. Ct. July 9, 2019) (applying the NYC FIFA to a claim brought by a resident of the Netherlands who performed freelance work on a mural located in New York City). Moreover, given the lack of guidance on how to assess the application of the NYC FIFA with respect to non-residents, New York courts have at times applied an impact standard test to determine whether a plaintiff is entitled to the protections

provided under the city law. See, e.g., Turner, 68 Misc. 3d at 388 (applying an impact standard to determine that a freelance worker was not entitled to the protections of the NYC FIFA because he was not a New York City resident and he performed the "vast majority" of his work from another state). Under this standard, courts consider whether a plaintiff alleges sufficient facts to show that the misconduct had an "impact within the city." Id. (internal quotation marks and citation omitted).

Plaintiff has alleged sufficient facts to plausibly establish that, despite being a non-resident, the protections provided under the NYC FIFA apply to her claims. In addition to being retained by Defendants after attending a trade show in New York City, Plaintiff "routinely performed work in New York City," including "frequently conduct[ing] meetings by phone" with Xia and other Maison employees, "ma[king] social media posts, and perform[ing] web design work" within the City. See Compl. ¶¶ 19–24 at pages 5–6; id. ¶ 25 at page 6 (estimating that she worked up to 25% of her time in New York City). Plaintiff's Amended Complaint also alleges sufficient facts to show that her termination arose from an incident involving Xia that occurred during a trade show in New York City. See id. at ¶¶ 73–86 (claiming that Defendants retaliated against her by terminating her after she refused to immediately sign a non-disclosure agreement related to comments Xia made during a trade show). Moreover, Plaintiff sufficiently alleges that Defendants also retaliated against her by contacting one of her New York City clients (Samelson Chatelane) to complain about her work, thus affecting her business relations with a separate New York City employer. See id. at ¶¶ 117–31 at pages 21–23. Plaintiff has thus plausibly alleged that she performed some work in New York City and that the challenged conduct had some impact on her within the city. Therefore, Defendants' motion to dismiss Plaintiff's NYC FIFA claim is denied.

### 3. Breach of Contract Claim (Count III)

In the alternative to Plaintiff's NYS and NYC FIFA claims, Plaintiff alleges that Defendants breached the parties' Service Agreement in violation of New York common law. See Compl. ¶¶ 134–42 (Count III). Defendants move to dismiss this alternative claim on the grounds that there was no breach because (1) they paid Plaintiff $85 per hour for 16 hours of work per week, as required under the Service Agreement, and (2) they never approved work beyond the 16-hour weekly cap. See Def. Br. at 15–16.

Under New York law, "to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between [herself] and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011). Plaintiff has alleged sufficient facts to plausibly show each of these elements.

The Amended Complaint sufficiently establishes that the parties entered into a service agreement and that, pursuant to the agreement, Plaintiff provided various digital media and marketing services for Defendants. See Compl. ¶¶ 22–24 at page 6. Defendants expressly agreed to pay Plaintiff at a rate of "$85 per hour for 16 hours of weekly social media work, with an additional art director rate of $120 per hour for specialized marketing and advertising projects." Id. ¶ 22 at 6. Defendants, however, routinely required Plaintiff to work several additional hours beyond the contracted 16 hours per week. See id. ¶¶ 31, 45–47 (Plaintiff estimating that she regularly worked between 25 to 30 hours per week). Despite being required to work several additional hours, Defendants paid Plaintiff for only 16 hours of work per week at the rate of $85, which allegedly resulted in over $30,000 in unpaid labor. Id. ¶¶ 47, 62. Moreover, Plaintiff also

sufficiently alleges that Defendants never paid her at the contracted rate of $120 per hour for the work she performed related to "specialized marketing and advertising projects." Id. ¶ 48.

Defendants argue that the Service Agreement expressly required Maison to approve additional work beyond the 16-hour weekly cap and that Defendants never approved any additional projects. See Def. Br. at 16. However, the Amended Complaint alleges multiple instances where Xia demanded additional work from Plaintiff beyond the contracted 16-hour cap. See, e.g., Compl. ¶¶ 34–37, 45–47. Such additional work demands from Xia plausibly suggest that she implicitly approved additional work beyond the 16-hour weekly cap.

Because Plaintiff has sufficiently alleged that Defendants failed to pay her for all the work she performed and at the agreed rates, the Amended Complaint plausibly pleads a breach of contract claim under New York common law. Therefore, Defendants' motion to dismiss Count III of the Amended Complaint is denied.

### 4. Plaintiff's Retaliation Claim Under FIFA (Count IV)

Plaintiff separately brings a retaliation claim against Defendants under both the NYS and the NYC FIFA. See Compl. ¶¶ 143–49 (Count IV). Defendants argue that Plaintiff's retaliation claim fails because the alleged retaliation did not arise from a qualifying adverse action. See Def. Br. 13–14.

Both the NYS and the NYC FIFA prohibit a hiring party from retaliating against a freelance worker for exercising their rights under the statutes, namely, the right to be paid on time and in full. See N.Y. Gen. Bus. Law § 1413 ("No hiring party . . . shall threaten, intimidate, discipline, harass, deny a work opportunity to, or discriminate against a freelance worker, or take any other action that penalizes a freelance worker for, or is reasonably likely to deter a freelance worker from, exercising or attempting to exercise any right guaranteed under [the statute], or

from obtaining any future work opportunity because the freelance worker has done so."); N.Y.C. Admin. Code § 20-930 (same). The Amended Complaint alleges sufficient facts to establish a plausible retaliation claim under the state and city anti-retaliation statutes.

On December 20, 2024, Plaintiff, through counsel, sent a pre-litigation demand letter to Defendants "outlining . . . unpaid wages in violation of the Freelance Isn't Free Act, and demanding pay[ment] of all unpaid invoices." Compl. ¶ 115. After Plaintiff exercised her FIFA right to demand payment for unpaid freelance work, Defendants allegedly retaliated against her by calling another one of her clients (Samelson Chatelane) to "warn" them about Plaintiff and accuse her of "ruin[ing]" Defendants' website. Id. ¶¶ 122–26 at page 20. Samelson Chatelane subsequently terminated Plaintiff's contract, which Plaintiff plausibly alleges was a direct result of Defendants' false accusations. Id. ¶ 130 at page 21.

While the FIFA statutes are silent on how to address such post-employment retaliation, Courts in this Circuit have found that post-employment retaliatory conduct can support a retaliation claim brought under other labor laws. See, e.g., Jian Zhong Li v. Oliver King Enters., Inc., No. 14-CV-9293 (VEC), 2015 WL 4643145, at *3 (S.D.N.Y. Aug. 4, 2015) (collecting cases finding that "in some circumstances plaintiffs can bring [FLSA] retaliation claims against former employers for post-employment conduct"); Porter v. MooreGroup Corp., No. 17-CV-07405 (KAM)(VMS), 2020 WL 32434, at *11 (E.D.N.Y. Jan. 2, 2020) (noting that "courts in the Second Circuit have recognized actionable retaliation claims in situations involving . . . employment-related harm") (internal quotation marks and citation omitted). Therefore, Plaintiff has sufficiently alleged that after exercising her rights under FIFA, Defendants engaged in post-employment retaliatory conduct that caused Plaintiff employment-related harm.

Accordingly, because Plaintiff has alleged a plausible retaliation claim under the NYS and NYC FIFA, Defendants' motion to dismiss Count IV of the Amended Complaint is denied.

**5. Retaliation Claim Under NYLL § 740 (Count V)**

In addition to her FIFA retaliation claim, Plaintiff also claims that Defendants unlawfully retaliated against her in violation of New York Labor Law ("NYLL") Section 740. See Compl. ¶¶ 150–56 (Count V). NYLL § 740 prohibits an employer from "tak[ing] any retaliatory action against an employee . . . because such employee . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation," or because the employee "objects to, or refuses to participate in any such activity, policy or practice." NYLL § 740(2)(a), (c). The statute expressly defines "employee" to include independent contractors such as Plaintiff. See id. at § 740(1)(a). To sufficiently plead a retaliation claim under NYLL § 740, a plaintiff must establish "(1) [a] retaliatory action, (2) [an] activity protected by the statute, and (3) a causal link between the two." Pierce v. Better Holdco, Inc., No. 22-CV-4748 (AT), 2023 WL 6386920, at *4 (S.D.N.Y. Sept. 29, 2023). Defendants contend that Plaintiff's § 740 claim fails because the Amended Complaint does not allege that she reported illegal conduct or that the alleged conduct endangered public health or safety. See Def. Br. at 15. Defendants, however, misread the statute and Plaintiff's allegations.

Construed in the light most favorable to Plaintiff, the Amended Complaint alleges that (1) Plaintiff heard Xia "declare[] her intent to 'hire someone to break the legs'" of another Maison employee (Compl. ¶ 74); (2) Plaintiff discussed the incident with one of her supervisors, Lasek (see id. ¶ 75); (3) "days after Plaintiff had reported" Xia's alleged "criminal statement," Defendants demanded that she immediately sign a non-disclosure agreement (id. ¶¶ 80–85, 92);

and (4) when Plaintiff requested a reasonable period to review the non-disclosure agreement with an attorney, Defendants abruptly terminated her employment contract (id. ¶ 86). Based on these facts, Plaintiff has alleged more than enough to state a plausible retaliation claim under NYLL § 740(2)(a). She sufficiently alleges (1) an action by her employer that she believed was in violation of the law (*i.e.*, Xia's threat to hire someone to cause physical harm to another employee); (2) that she reported the incident and discussed it with one of her supervisors; and (3) that she was terminated shortly after reporting the incident.

Contrary to Defendants' argument, it is not necessary for Plaintiff to show that the alleged conduct endangered public health or safety—the statute expressly provides that showing a danger to public health or safety is just one way that a plaintiff can establish a retaliation claim under § 740(2)(a). See NYLL § 740(2)(a) ("An employer shall not take any retaliatory action against an employee . . . because such employee . . . discloses, or threatens to disclose . . . an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety.") (emphasis added). Moreover, Plaintiff "need not plead an actual violation of laws or regulations to survive a motion to dismiss." Lawlor v. Wymbs, Inc., 212 A.D.3d 442, 443 (1st Dep't 2023) (citation omitted). Her allegation that Xia's comment indicated a criminal intent is sufficient to plausibly allege an activity that Plaintiff "reasonably believe[d]" was in violation of the law. NYLL § 740(2)(a).

Although it is unclear exactly who Plaintiff "reported" Xia's alleged unlawful activity to, the Amended Complaint contains enough allegations to otherwise state a claim for unlawful retaliation under NYLL § 740(2)(c). "Retaliation due to disclosure of an unlawful activity or practice to a supervisor is not the only way an employer can run afoul of Section 740; an

employer can also violate that section if it retaliates against an employee because the employee 'objects to, or refuses to participate' in that activity or practice." Goldberg v. Bespoke Real Est. LLC, No. 23-CV-5614 (JPO), 2024 WL 1256006, at *10 (S.D.N.Y. Mar. 25, 2024) (quoting NYLL § 740(2)(c)). Plaintiff's Amended Complaint alleges sufficient facts to plausibly show that Plaintiff objected to Xia's hostile comment by discussing the incident with Lasek, and that her contract with Maison was terminated shortly thereafter. See Compl. ¶¶ 73–87, 92. Therefore, because Plaintiff also alleges a sufficient retaliation claim under NYLL § 740(2)(c), Defendants' motion to dismiss Count V is denied.

### 6. Plaintiff's Tortious Interference Claim (Count VII)

As an alternative to her defamation claim (Count VI), which the Court dismisses for lack of personal jurisdiction, see supra Section I.B.2., Plaintiff brings a tortious interference claim under New York common law. See Compl. ¶¶ 168–78. As discussed above, Plaintiff alleges that, in early 2025, Xia called Samelson Chatelane (one of Plaintiff's other employers) and falsely accused Plaintiff of "ruin[ing]" Defendants' website and claimed that Defendants were "in a lawsuit" with Plaintiff. Id. ¶¶ 124 at page 20. Plaintiff claims that Xia made these false statements with the purpose of interfering with her separate business relations and that, because of Xia's calls, Samelson Chatelane abruptly terminated Plaintiff's freelance contract. See id. ¶¶ 174–78. Defendants argue that Plaintiff fails to sufficiently state a tortious interference claim because she does not sufficiently allege that Xia's calls caused Samelson Chatelane to terminate Plaintiff. See Def. Br. at 18.

Under New York law, the elements of a tortious interference claim are: "(1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge of that contract, (3) defendant's intentional procurement of the third-party's breach of the contract

without justification, (4) actual breach of the contract, and (5) damages resulting therefrom." Rich v. Fox News Network, LLC, 939 F.3d 112, 126–27 (2d Cir. 2019) (citation omitted); see also Roadrunner Charters, Inc. v. New York City, et al., No. 25-CV-01285 (JAV), 2026 WL 2149758, at *5 (S.D.N.Y. July 27, 2026) ("Under New York law, tortious interference with contract and tortious interference with contractual relations are the same claim with the same required elements.").

The Amended Complaint includes sufficient facts to plausibly establish the elements of a tortious interference claim. Plaintiff sufficiently alleges that (1) she had an employment contract with Samelson Chatelane (see Compl. ¶¶ 117–20 at pages 19–20); (2) Xia knew that Plaintiff worked for Samelson Chatelane (see id. ¶ 125 at page 20); (3) Xia called Samelson Chatelane multiple times with the intention of harming Plaintiff's business relationship with Samelson Chatelane (id. ¶¶ 122–27 at pages 20–21, ¶¶ 174–76); (4) shortly after Xia's calls, Samelson Chatelane abruptly terminated its contract with Plaintiff (id. ¶ 130 at page 21); and (5) as a result, Plaintiff suffered financial harm (id. ¶¶ 177–78).

Defendants contend that Plaintiff's tortious interference claim is based purely on speculation that Xia called Samelson Chatelane. See Def. Br. at 18. But Plaintiff's Amended Complaint puts forward enough facts to plausibly support her claim. See id. ¶ 123 at page 20 (claiming that Plaintiff's supervisor at Samelson Chatelane confirmed that Xia called her "multiple times"); id. ¶ 126 (alleging that a separate Samelson Chatelane employee "independently verified that the[] phone calls were placed by Defendant Xia from a phone number associated with Defendant Maison"). Plaintiff thus alleges sufficient facts to allow the Court to draw a reasonable inference that Xia called Samelson Chatelane with the intent to harm Plaintiff's separate business relations.

Therefore, because Plaintiff alleges enough facts to state a plausible tortious interference claim under New York law, Defendants' motion to dismiss Count VII of the Amended Complaint is denied.

**III. Leave to Amend**

Although Plaintiff has not requested leave to further amend her complaint, the Court has considered whether she should be given an opportunity to do so with respect to her dismissed defamation claim. The Court has discretion to grant leave to amend where "justice so requires," Fed. R. Civ. P. 15(a)(2), however, leave to amend should generally be denied "in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008).

Plaintiff amended her complaint after Defendants filed a motion to dismiss the initial complaint, which raised the same personal jurisdiction arguments that Defendants raised in response to Plaintiff's Amended Complaint. See ECF No. 15. Plaintiff already had notice of specific flaws with her defamation claim and had sufficient opportunity to cure those deficiencies. Therefore, further amendment at this point would be unavailing. See Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend."); Scodtt v. City of New York, No. 24-CV-02132 (MKV), 2025 WL 2530560, at *8 (S.D.N.Y. Sept. 3, 2025) (finding that amendment was futile where a "[p]laintiff was already provided the opportunity to amend her complaint in response to [d]efendant's arguments"). Accordingly, Plaintiff will not be granted leave to further amend her complaint.

## CONCLUSION

Defendants' motion to dismiss is GRANTED in part and DENIED in part. Defendants' motion to dismiss is GRANTED for lack of personal jurisdiction with respect to Plaintiff's defamation claim and, therefore, Count VI of the Amended Complaint is DISMISSED without prejudice. Defendants' motion to dismiss is DENIED with respect to Plaintiff's remaining claims (Counts I–V and VII).

Defendants shall answer the Amended Complaint, consistent with this Opinion and Order within 21 days. By separate order, the Court will schedule an Initial Case Management Conference.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED: September 1, 2026
New York, New York